UNITED STATES DISTRICT COURT FILED
DISTRICT OF CONNECTICUT

Nov 19  4 46 PM '03

U S DISTRICT COURT
NEW HAVEN, CONN.

KAREN S. ABLOW, As Parent          :
and Next Friend and Guardian of    :
KIPP MILONE,                       :
                    Plaintiff      :
                                   :
                                   :
                                   :
        v.                         :      3:02-CV-300 (EBB)
                                   :
CANADA LIFE ASSURANCE COMPANY,     :
                    Defendant      :
                                   :

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

### INTRODUCTION

This insurance coverage case arises from the death, on May 9, 2000, of Richard H. Milone ("Milone"), an employee of United Rentals, Inc.  At the time of his death, Milone was covered by two insurance policies offered by his employer: Group Life Policy No. G.44165 and Group Accident and Sickness Policy No. H.44165. Both policies were issued by Defendant, Canada Life Assurance Co. ("Defendant" or "Canada Life").  Under the terms of the Group Life Policy, Defendant paid Plaintiff, Karen Ablow ("Plaintiff" or "Ablow"), the mother of the beneficiary, Kipp Milone, the sum of $103,808.63, representing full payment under the Group Life Policy, plus interest.  However, based upon the terms of the Group Accident and Sickness Policy and the manner of Milone's death, Canada Life denied Plaintiff's claim for accidental benefits thereunder.  Plaintiff appealed this decision to Canada Life on two occasions.  It was denied both times.  This litigation followed.  It is an action to recover accidental death

benefits under the Employment Retirement Income Security Act
("ERISA"), 29 U.S.C. Section 1001, et seq.

In Count One of her Complaint, the Plaintiff alleges that
Canada Life wrongfully denied her claim for accidental death
benefits under the Group Accident and Sickness Policy No. H.44165
(the "Policy").[1]  In Count Three of her Complaint, Plaintiff
alleges that the language contained in the Exclusions section of
the Policy is overly broad and burdensome, is not calculated to
be understood by the average plan participant, and thus violates
the spirit of Section 1022(a)(1) of ERISA and is void against
public policy.[2]/

After two unsuccessful settlement conferences with the
Honorable Joan G. Margolis, the parties agreed to submit cross-
motions for summary judgment.  The Motions are now ready for
decision.

## STATEMENT OF FACTS

The facts of this case are undisputed by the parties.  *See*
Defendant's Local Rule 9(c)(1) Statement (April 30, 2003) and
Plaintiff's Local Rule (c)(2) Statement (June 19, 2003).

On May 2, 2000, at approximately 8:10 a.m., Milone was found
dead in his secured hotel room in Olathe, Kansas, by a hotel
maintenance worker.  He was 43 years old at the time of his
death.  Present in the decedent's hotel room was a bottle of

---

[1]/ During the settlement conference, Plaintiff withdrew Count Two of
her Complaint.

[2]/ 29 U.S.C. Section 1022 deals with summary plan descriptions only and
has no subpart (a)(1).

vodka that was 3/4 empty and a bottle of Ephedrine with forty-five missing tablets.  Ephedrine is a stimulant which has been linked to serious health effects, including heart attack, stroke, psychoses, seizure and death. See 62 Fed.Reg. 30678 (1997). [3]/

Drug paraphernalia at the scene suggested that Milone had crushed and insufflated (breathed up his nose) the Ephedrine.  Milone had a past medical history of alcohol and Ephedrine abuse, and a stroke sustained at age 37, six years prior to his death.

On May 10, 2000, Dr. Michael S. Handler performed an autopsy on Milone's body and compiled an Autopsy Report.  In the Autopsy Report, Dr. Handler stated that:

> This 43 year old male, Richard H. Milone, died of Ephedrine toxicity. Cardiomegaly was a significant contributing factor.
>
> Reportedly the decedent was [sic] arrived in the Kansas City area for a business trip on the afternoon of May 8, 2000.  He was last seen alive by his business partner at approximately 21:00, May 8, 2000, and had communicated with his wife by telephone at 21:52. He was found dead in his secured room by a hotel maintenance worker at 08:10 the following morning after he failed to appear at a 6:30 a.m. meeting.  His past medical history is significant for alcohol and Ephedrine abuse and a stroke sustained six years earlier.  Present in his hotel room was a bottle of Vodka that was 3/4 empty and a bottle of Ephedrine with 45 missing tablets.  Drug paraphernalia at the scene suggested that the Ephedrine

---

[3]/ Although Plaintiff admitted the dangers of Ephedrine, see Plaintiff's Statement of Undisputed Facts at ¶ 3, in her Memorandum of Law, she asserts that Ephedrine is "a bronchodilator used to treat the symptoms of asthma or to treat bronchitis and emphysema."  The record is devoid, as is the autopsy report, of any evidence that Milone had asthma, emphysema, or bronchitis at the time of his death.

was crushed and insufflated.

Autopsy revealed dilated cardiomegaly
and a healed infarct (stroke) in the
right globus pallidus interna.

Toxicology revealed ephedrine in heart
(5.2 mcg/ml), femoral (3.7 mcg/ml),
blood and liver tissue (13.8 mcg/ml),
and ethanol in heart blood (.9% O) [sic] and
vitreous fluid (0.10%).  No other
drugs of abuse are in the urine.

The manner of death is accident.

Milone's death certificate states that the immediate cause
of death was "ephedrine toxicity", resulting from a "drug
overdose."

As noted above, Milone was covered by two insurance policies
at the time of his death.  The Group Accident and Sickness Policy
No. H.44165 (the "Policy") is at issue in this case.  The Policy
contains the following clause concerning accidental death and
dismemberment benefits:

### ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT

#### Benefit

We will pay the amount described in the Schedule of Losses
if a person suffers any such Loss, subject to the following
conditions:

1.  The Loss is caused solely by
    an accident.

2.  The Loss is not excluded by
    the terms of the Exclusions
    section of this provision.

The Exclusions section of the Policy provides, in pertinent
part, as follows:

4

## Exclusions

No amount of Benefit will be payable under this provision if the Loss resulted either directly or indirectly from, or was in any manner or degree associated with, or occasioned by, any one of more of:

1. Intentionally self-inflicted injury.

2. War, declared or undeclared, or any act of war.

3. Active participation in any riot or violent disorder.

4. The person either taking or attempting to take his own life whether he is in possession of his mental faculties or not at the time.

5. Bodily or mental infirmity or illness or disease of any kind, or medical or surgical treatment thereof.

6. Poisoning in any form, inhalation of gas or fumes.

Defendant first denied benefits under the Policy in reliance on paragraph 6. After Plaintiff's appeal of Canada Life's initial decision, the Company again denied her claim, adding paragraph 5 as another reason for refusing to pay the claim.

## LEGAL ANALYSIS

### I.  The Standards of Review

### A.  Federal Rule of Civil Procedure 56

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported

5

motion for summary judgment).  Although the moving party has the
initial burden of establishing that no factual issues exist,
"[o]nce that burden is met, the opposing party must set forth
specific facts demonstrating that there is a genuine issue for
trial."  <u>Sylvestre v. United States</u>, 771 F.Supp. 515, 516
(D.Conn. 1990).

If the nonmoving party has failed to make a sufficient
showing on an essential element of his case with respect to which
she has the burden of proof at trial, then summary judgment is
appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).
"In such a situation, there can be `no genuine issue as to any
material fact,' since a complete failure of proof concerning an
essential element of the nonmoving party's case necessarily
renders all other facts immaterial."  <i>Id.</i> at 322-23.  <i>Accord,</i>
<u>Goenaga v. March of Dimes Birth Defects Foundation</u>, 51 F.3d 14,
18 (2d. Cir. 1995)(movant's burden satisfied by showing if it can
point to an absence of evidence to support an essential element
of nonmoving party's claim).  In this regard, mere assertions and
conclusions of the party opposing summary judgment are not enough
to defend a well-pleaded motion.  <u>Lamontagne v. E.I. DuPont de
Nemours & Co.</u>, 834 F.Supp 576, 580 (D.Conn. 1993), <i>aff'd</i> 41 F.3d
846 (2d Cir. 1994).

The court is mandated to "resolve all ambiguities and draw
all inferences in favor of the nonmoving party. . . ."  <u>Aldrich
v. Randolph Cent. Sch. Dist.</u>, 963 F.2d. 520, 523 (2d Cir.), <i>cert.</i>

6

*denied*, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-52 (scintilla of evidence in support of plaintiff's position insufficient; there must be evidence from which a jury could reasonably find in his favor). *See also*, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

The burden does not shift when cross-motions for summary judgment are before the Court. Brooke v. Home Life Ins. Co., 864 F.Supp. 296, 299 (D.Conn. 1994). Each motion must be decided on its own merits. Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir. 1981). The mere fact that both parties insist that no material issues of fact exist "does not establish that a trial is unnecessary." 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720, at 17 (2d ed. 1983).

B.   **ERISA**

A denial of benefits under an ERISA-governed plan is reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

7

the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  In the present case, both parties agree that the Policy is an ERISA-governed Plan which does not give the administrator discretionary authority.  Therefore, this Court will review Canada Life's denial of benefits under a <u>de novo</u> standard of review.

When faced with questions of insurance policy interpretation under ERISA, federal courts are to apply "the federal common law of rights and obligations under ERISA-regulated plans." <u>Firestone</u>, 489 U.S. at 110 (internal quotations marks omitted).[4]/ The federal common law governing ERISA embodies common-sense canons of contract interpretation.  <u>Brooke</u>, 864 F.Supp. at 299, <u>citing</u> <u>Fischman v. Blue Cross & Blue Shield of Connecticut, Inc.</u>, 775 F.Supp. 513, 515 (D.Conn. 1991).  Accordingly, straight-forward language in an insurance policy must be given its natural meaning.  <u>Fischman</u>, 775 F.Supp. at 516.

In applying these principles, the court interprets and enforces "unambiguous language in an ERISA plan" according to its "plain meaning".  <u>Aramony v. United Way Replacement Benefit Plan</u>, 191 F.3d 140, 149 (2d Cir. 1999).  "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a

---

[4]/ Although the parties have agreed that the Policy is governed by ERISA, Plaintiff fails to follow federal common law.  In its place, she analyzes, and relies on, over a dozen cases from various state courts in support of her argument that she is entitled to accidental death benefits.  However, in each of these decisions, the analysis performed by each Court was pursuant to the **state law** of each jurisdiction analyzed.  Accordingly, they must be rejected under ERISA and the mandatory authority of <u>Firestone</u>.

reasonably intelligent person who has examined the context of the entire integrated agreement." <u>O'Neil v. Retirement Plan for Salaried employees of RKO Gen., Inc.</u>, 37 F.3d 55, 59 (2d Cir. 1994)(internal quotation marks omitted).  In making a determination of ambiguity, "reference may be had to matters external to the entire integrated agreement." <u>Aramony</u>, 191 F.3d at 149; <u>O'Neil</u>, 37 F.3d at 58-59.  For words not defined in the agreement, a non-legal dictionary can supply the everyday, common meaning.  <i>See, e.g.,</i> <u>United States v. Dauray</u>, 215 F.3d 257, 260 (2d Cir. 2000)(court used Webster's Third New International Dictionary for definitions to help find "ordinary, common-sense meaning of the words.")

II.  **The Standards As Applied**

A.  **Was Milone's Death An Accident ?**

A prerequisite to eligibility for benefits under the Policy is that the plan participant's death must be "caused solely by accident"  Policy at 15.  The seminal decision in determining if a death was caused solely by an accident is <u>Wickman v. Northwestern National Insurance Company</u>, 908 F.2d 1077 (1st Cir.), <i>cert. denied</i>, 498 U.S. 1013 (1990).

In <u>Wickman</u>, the decedent had climbed over a guardrail on a highway overpass, held onto the guardrail with only his right hand, and was subsequently seen freefalling to the railroad tracks, forty to fifty feet below. Mr. Wickman died later that evening.  His widow sued Northwestern after being denied

9

accidental death and dismemberment benefits.  The insurer
declined payment, noting that it did not pay benefits if the loss
was either directly or indirectly caused by "suicide or
intentionally self-inflicted injury, whether . . . sane or
insane." *Wickman*, 908 F.2d at 1081. The Plaintiff insisted that
her husband had not committed suicide or intended to harm
himself, claiming that the death was accidental. Following a
bench trial, the Magistrate Judge held that "[the deceased] knew
or should have known that serious bodily injury or death was a
probable consequence substantially likely to occur as a result of
his volitional act of placing himself outside of the guardrail
and hanging with one hand." *Id.*  Thus, his death was not an
accident.  The plaintiff thereafter appealed the Magistrate
Judge's decision.

    After an extended discussion on the various tests which had
been applied in the past to the term "accident", the *Wickman*
Court set forth a three-pronged, subjective/objective test to be
used in determining what constitutes "accidental" death.  First,
the fact-finder must consider "the reasonable expectations of the
insured when the policy was purchased." *Id.* at 1088.  Second,
"[i]f the fact-finder determines that the insured did not expect
an injury similar in type or kind to that suffered, the fact-
finder must then determine whether the suppositions which
underlay that expectation is reasonable." *Id.* This requirement
"will prevent unrealistic expectations from undermining the

10

purpose of accident insurance." *Id.* Hence, if the fact-finder determines that the insured's suppositions were unreasonable, the loss will not be considered to be an accident. *Id.* Third, if the fact-finder cannot determine the insured's subjective expectation, she must turn to an objective analysis. The fact-finder must then ask "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* "Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that [an] accident should be judged from the perspective of the insured." *Id.*

Applying these concepts, the <u>Wickman</u> Court held that the Magistrate Judge had not erred in ruling that the plaintiff's decedent's death was not an accident within the terms of the insurance policy.

The court in <u>McLain v. Metropolitan Life Insurance, Company.</u> 820 F.Supp. 169 (D.N.J 1993), applying <u>Wickman</u> to a death by drug overdose, held that the death was not accidental. "To determine whether J. McLain `either actually expected or reasonably should have expected' to die of an acute drug reaction an inquiry into his subjective and objective expectations must be conducted." <u>McLain</u>, 820 F.Supp. at 177, *citing to* <u>Wickman</u>, 908 F.2d at 1086.

Ms. McLain asserted that her husband did not expect to die

11

from the amount of cocaine he ingested; rather he expected only euphoria. "[I]n light of J. McLain's background and characteristics, this expectation is unreasonable." McLain, 820 F.Supp. at 178. Ms. McLain's own statement included the fact that her husband was in the habit of using cocaine. He, according to his wife's statement, "had been using cocaine on a regular basis for a long period" Id. Finally, according to the autopsy report, McLain died as a result of an "acute drug reaction" Id.

In quoting from the Defendant's Memorandum of Law therein, the McLain Court agreed that:

> The hazards of cocaine use are universally
> known; the horrors of drug use are paraded
> nightly on television, recounted in newspapers,
> books, and magazines in great detail, and have
> been the subject of numerous television movies
> and films.

Id.

"This is not an instance where the victim was experimenting with cocaine for the first time. J.McLain was a habitual user of cocaine. . . [he] knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of the use of cocaine." Id. Accordingly, his death was not an accident.

An application of Wickman and McLain to the present case leads this Court to hold that Milone's death was not an accident within the meaning of the Policy. As to the first Wickman prong, the Court agrees with Defendant that Milone could not reasonably

12

expect that the Policy would protect him from his voluntary drug and alcohol abuse.  Secondly, it belies credulity to believe that Milone, as a person with an extensive history of alcohol and Ephedrine abuse, and who had suffered a stroke six years earlier, would not know that the ingestion of approximately forty-five tablets of crushed Ephedrine and 3/4 of a bottle of vodka might lead to his death.  Thirdly, even if Milone was himself naive enough to ignore this incredible danger, no reasonable person with his background and characteristics would have done so.

Plaintiff contends that her husband's death was an accident. She first bases this on the fact that, because Canada Life paid her full benefits under Group Life Policy Number **G**.44165, it "seemingly conceded that Richard Milone's death was accidental." Plaintiff's Memorandum of Law at 7.  Apparently, Plaintiff does not realize that, while she was paid under a policy that contained no exclusions, the denial of benefits was under a second, **separate** Group Accident and Sickness Policy Number **H**.44165, which contains the six exclusions listed above.  Thus, this argument is unavailing.

Plaintiff next asserts that, since the coroner indicated in the Autopsy Report that the "manner" of Milone's death was an "accident", this Court must conclude that Milone's death was accidental within the terms of the Policy. Plaintiff's Memorandum of Law at 14.  The Court disagrees. In preparing an autopsy report, a medical examiner normally has just five choices of

13

"manner" of death: accident, suicide, homicide, natural, or undetermined. *See* Report of Death of Richard H. Milone, Exhibit B to Defendant's Memorandum of Law. *See* also <u>Klei v. Metropolitan Life Insurance Co.</u>, 1992 WL 695749 at 10; <u>Mullaney v. Aetna U.S. Healthcare</u>, 103 F.Supp.2d 486, 491 (D.R.I 2000). "[T]he Court finds that the medical examiner's classification of the manner of death to be of little or no import. . . ." <u>Klei</u>, at 10. *Accord*, <u>Mullaney</u>, 103 F.Supp.2d at 491 (medical examiner's determination of "accident" does not mean it had same connotation as "accident" in policy). This Court agrees with the rationales of these two courts and holds that Dr. Handler's notation of death caused by "accident" is irrelevant to this Court's legal analysis of an ERISA-based Policy.

Where, as here, "accident" is not defined in an insurance policy, the federal courts interpret the term in "an ordinary and popular sense, in the way that a person of average intelligence and experience would." <u>Santaella v. Metropolitan Life Ins. Co.</u>, 123 F.3d 456, 462 (7th Cir. 1997). The <u>Santaella</u> Court, citing to <u>Casey v. Uddeholm Corp.</u>, 32 F.3d 1094, 1097 (7th Cir. 1994), defined the term "accidental", as it is commonly defined, as "unexpected or unintentional". *Id. See also* <u>Wickman</u>, 908 F.2d at 1085 ("The question comes down to what level of expectation is necessary for an act to constitute an accident."). When a court is called upon to determine whether a certain result is accidental, "it is customary to look at the casualty from the

14

point of view of the insured". Appleman, *Insurance Law and Practice* § 360 at 452-53. *Accord* <u>Wickman</u>, 908 F.2d at 1087 (noting that the common law prescribes that policy contract terms should be judged from the viewpoint of the insured). "However, when, as is usually the case, the evidence is not sufficient to ascertain with certainty the subjective expectation or intent of the decedent, an objective reasonable person standard must be employed to determine the insured's expectation." <u>Santaella</u>, 123 F.3d at 456. The <u>Santaella</u> Court derived its analysis from the Fifth Circuit case of <u>Todd v. AIG Life Insurance. Company.</u>, 47 F.3d 1448, 1456 (5th Cir. 1995), which set forth the following methodology for determining whether a death was accidental:

> [F]or death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the insured's conduct.

Following this method, the <u>Santaella</u> Court found that, under the facts peculiar to those in front of the Court, the death from a drug overdose at issue was accidental. *Id*. at 464. Although the decedent's family reported prior drug abuse, the medical records were silent as to the extent of such abuse. Likewise, the records did not reveal the exact amount of the drug she had taken. The unrebutted expert testimony was that the dosage taken by the decedent was three times lower than the average lethal dose. "Employing the methodology of <u>Todd</u> and <u>Wickman</u>, we must

15

conclude that the record requires the conclusion that [the decedent] had a subjective expectation of survival and that such an expectation was objectively reasonable because death was not certain or even highly likely to result from her conduct.  It was an accident."  *Id.*

Although Plaintiff cites <u>Santaella</u> as supportive of her claim that Milone's death was an accident and not a self-inflicted injury, the case is too easily distinguishable to be of assistance to her.  In contrast to the decedent therein, there is no evidence that Milone was taking Ephedrine and vodka for a medical condition.  There is also no evidence that he had a prescription for Ephedrine, or that a doctor advised him to take it - - especially forty-five tablets, crushed and insufflated, along with 3/4 of a bottle of vodka.  This combination of an extraordinarily dangerous drug, taken in enormous dosage, compounded by alcohol, is certainly not less than a lethal dosage.  Even if Milone had a subjective expectation of surviving this large dosage, such expectation was not objectively reasonable, as death was substantially likely to result from his conduct.  For these reasons, the Court finds that Milone's death was not an accident.

> B.  **Was Milone's Death An Intentionally Self-Inflicted Injury ?**

Plaintiff relies almost exclusively upon reported decisions from various states, interpreting state law, in support of her argument that Milone's death was not an intentionally self-

inflicted injury.  *See* Plaintiff's Memorandum of Law at 6-15.  In contradistinction, Defendant cites numerous federal ERISA-based cases which stand for the correct standard of review: "[w]hen faced with questions of insurance policy under ERISA, the issues presented are fully governed by the substantive law of ERISA." Firestone, 489 U.S. at 656-67 (citation omitted).  This body of law is comprised of the ERISA statute itself, and if ERISA is silent, the federal common law of ERISA as developed by the federal courts.  Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 281 (7th Cir.) (*en banc*), *cert. denied*, 498 U.S. 820 (1990).  The following cases, using this rationale, are persuasive authority for the fact that this death was intentionally self-inflicted.  See Critchlow v. First Unum Life Insurance Company of America, 198 F.Supp.2d 318 (W.D.N.Y. 2002) (decedent's death from autoerotic asphyxiation intentional self-inflicted injury); Cronin v. Zurich American Ins. Co., 189 F.Supp.2d 29 (S.D.N.Y. 2002) (same); Gerdes v. John Hancock Mutual Life Ins. Co., 199 F.Supp.2d 861 (C.D.Ill. 2001) (decedent's death from ingestion of cocaine, morphine, and alcohol was self-inflicted injury); Holsinger v. New England Mutual Life Ins. Co., 765 F.Supp. 1279 (E.D.Mich. 1991) (decedent's death from ingestion of quantity of codeine was result of self-inflicted injury); Klei v. Metropolitan Life Ins. Co , 1992 WL 695749 (E.D.Mich. 1992) (decedent's death from acute alcohol intoxication self-inflicted injury),

Federal district courts have found that, in order to determine whether an exclusion for intentional self-inflicted injury applies to the facts of a case involving the ingestion of drugs, a court should examine four factors:

>    1) Was the ingestion intentional ?
>
>    2) Did the insured know that the ingestion would be likely to cause an injury ?
>
>    3) Did the ingestion cause an injury ?
>
>    4) Did the loss result from the injury ?

Bevans v. Iron Workers' TriState Welfare Plan, 971 F.Supp. 357, 361 (C.D. Ill. 1997).  *Accord* Gerdes  199 F.Supp.2d at 864; Holsinger, 765 F.Supp. at 1282; McLain, 820 F.Supp. at 178; Klei, 1992 WL 695749 at *8.

>    It is not necessary that the person ingesting the drugs know that death could result.  If the person ingesting the drug has a general cognizance that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss.

Gerdes, 199 F.Supp.2d at 865.  In Gerdes, the decedent had ingested a combination of heroin, cocaine and ethanol.  "This mixture of drugs is among the most harmful and lethal of those drugs available on the street." *Id.*  The Court held that it would be unreasonable to believe that the decedent did not know that his ingestion of these three drugs could cause serious injury and possible death.  Accordingly, the decedent's "voluntary participation in such dangerous action leaves no doubt that the resulting injuries are `intentionally self-inflicted'.

18

Therefore, the exclusion applies.  There is no recovery under the
policy."  *Id.* at 866.

     Applying this four-part test to the death of Milone can
result in no other decision but that his death was caused by an
intentional self-inflicted injury.  The first inquiry must be
answered in the affirmative because Milone intentionally ingested
a massive amount of Ephedrine and alcohol on the night of his
death.

     In deciding the second inquiry, Milone only needed to have a
"general cognizance" that the ingestion of Ephedrine and alcohol
could produce injury.  McLain, 820 F.Supp. at 179; Holsinger, 765
F.Supp. at 1282 (beyond peradventure that the drugs did cause
injury that decedent expected . . . and that injury ultimately
contributed to his death).  *See also* Metropolitan Life Ins. Co. v.
Main, 383 F2d. 952, 958 (1st Cir. 1965)(effect of alcohol and
drugs causes an injury of a chemical nature on . . . the . . .
brain).  This, too, must be answered in the affirmative.  Milone
had a prior history of Ephedrine and alcohol abuse and had
suffered a stroke six years before his death.  Based on his own
experiences, Milone should have expected that an injury would
occur as the result of insufflating approximately forty-five
tablets of crushed Ephedrine and consuming 3/4 of a bottle of
vodka.  As to the third and fourth factors, Milone's death
certificate states that the immediate cause of death was
"Ephedrine toxcity" resulting from a "drug overdose."  Hence, the
ingestion of the Ephedrine and alcohol caused an injury and the

19

injury caused a great loss.  Unfortunately and tragically, this was a risk he was willing to take - - and he paid with his life.

   C.  **Was Milone's Death Due to Illness or Disease ?**

   Again, Plaintiff exclusively relies upon state law in support of her claim that Milone's death was not the result of any illness or disease.  *See* Plaintiff's Memorandum of Law at 15-18.  She overlooks all federal ERISA-based decisions which have analyzed exclusionary clauses which preclude recovery of benefits if the death results from a pre-existing disease or illness.  *See, e.g.*, Ann Arbor Trust Co. v. Canada Life Assurance Co., 810 F.2d 591 (6th Cir. 1987)(reversing district court:alcoholism is a pre-existing disease which resulted in cirrhosis and death, therefore, no recovery under the policy); Klei, 1992 WL 695749 at *11 (record before court shows that disease, i.e., alcoholism, caused his death; therefore, no recovery under "illness or pre-existing illness" claims).  Such an exclusionary clause precludes the payment of benefits where death results from a pre-existing disease or from a combination of a pre-existing disease and an accident.  Ann Arbor, 810 F.2d at 593.

   In Klei, the Court held that the decedent's death from acute intoxication had not been an accident, but was an intentional self-inflicted injury. Klei, 1992 WL 695749 at *10.  However, the Klei Court also determined that alcoholism was a disease which had contributed to his death.  Thus, the plaintiff's claim for benefits was also precluded by the exclusion for death "caused

20

wholly or partly, directly or indirectly by disease or bodily or mental infirmity. *Id.*

"Alcoholism and drug addiction are lifetime diseases."  Both are "chronic, progressive, and, ultimately, fatal."  <u>Tsombanidis v. City of West Haven</u>, 180 F.Supp.2d 262, 273 (D.Conn. 2001).  It is beyond cavil that Milone suffered from this dual addiction and disease.  He had an extensive history of abusing drugs, and a stroke suffered six years prior to his death.  The autopsy report states that Milone "died of Ephedrine toxicity."  Likewise, his death certificate states that the immediate cause of death was "Ephedrine toxicity" resulting from "drug overdose."  His death certificate also lists cardiomegaly, an enlarged heart, as another significant condition contributing to his death.  Cardiomegaly is a disease.  <u>Bethune v. Finch</u>, 302 F.Supp. 425, 435 (W.D.Miss. 1969).  In interpreting the prohibitions of an ERISA plan, the terms of the policy must be given their plain meanings, meanings which comport with the interpretations given by the average person. <u>Wickman</u>, 908 F.2d at 1084. In this case, Milone died from a combination of two pre-existing illnesses and diseases - - the dual addiction to drugs and alcohol and cardiomegaly.  Thus, Defendant did not err in declining payment under Policy Exclusion No. 5.

The federal courts have also held that the exclusion for "illness or disease of any kind" in an accidental death and dismemberment policy is unambiguous. *See, e.g.* <u>Ann Arbor Trust Co.</u>, 810 F.2d at 593. When a policy insuring against accidental

death contains exclusionary language substantially to the effect
that benefits are precluded where death directly or indirectly
results from or is contributed to by disease, the inquiry is
properly limited to determining if the accident alone was
sufficient to cause death directly and independently of disease;
"an exclusionary clause therefore precludes recovery where death
results from a pre-existing disease or from a combination of
accident and pre-existing disease." *Id.* Again, following the
plain language of the Policy, Plaintiff's claim is precluded by
explicit language, excluding benefits for any loss which
"resulted either directly or indirectly from, or was in any
manner or degree associated with, or occasioned by . . . [b]odily
or mental infirmity or illness of any kind . . . ." *See* Policy
Exclusions, No. 5, at 16.

**D.  Was Milone's Death Due to Poisoning ?**

Milone, as noted above, died of "Ephedrine toxicity"
resulting from a drug overdose. "The term `toxic,' for purposes
of both contemporary and legal usage, has been defined as `of or
relating to poison'." Zen Continental Co., Inc. v. Intercargo
Ins. Co., 151 F.Supp.2d 250, 263-64 (S.D.N.Y. 2001), *citing The*
*Oxford Dictionary and Thesaurus at 1617 and Black's Law*
*Dictionary at 1492.* The term "poison" is commonly defined as "a
substance that when introduced into or absorbed by a living
organism causes death or injury." *Id.* at 264 n.26, *citing The*

22

*Oxford Dictionary and Thesaurus at 1151.*

Plaintiff urges the Court to use the definition of "poison" found in Black's Law Dictionary, Fifth edition:

> A substance having an inherent deleterious property which renders it, when taken into the system, capable of destroying life.  A substance which, on being applied to the human body, internally or externally, is capable of destroying the action of vital functions, or of placing the solids and fluids in such a state as to prevent the continuance of life.

Black's Law Dictionary (5th ed.).[5]/

Plaintiff then cites non-ERISA cases, applying various states' laws.  Milone died of Ephedrine toxicity, which Ephedrine he insufflated in a massive amount, causing death.  Ephedrine is an inherently deleterious property inasmuch as it is a stimulant which has been linked to serious health effects, including heart attack, stroke, psychoses, seizure and death. *See* 62 Fed.Reg. 30678 (1997).  It is also a precursor drug used in manufacturing of methamphetamine.  <u>State v. Burlington</u>, 783 N.E.2d 338, 346 (Ind.Ct.App. 2003).  Finally, when he ingested the amount of Ephedrine and alcohol that he did, Milone was undoubtedly taking an inherently deleterious substance, internally, which ingestion stopped his heart.  Thus, even under Plaintiff's chosen definition, Milone suffered a death by a poison.

---

[5]/ The 7th edition of Black's Legal Dictionary, upon which the Court normally relies, has dropped the word "poison" from its pages and, thus, carries no legal definition of the word.

23

## D.   Is the Policy Language Ambiguous ?

The Court begins its analysis by noting that a review of an ERISA-regulated insurance policy must give due respect to the plain language of the policy.  As explained by the First Circuit Court of Appeals:

> Notwithstanding the ennobling purposes
> which prompted passage of ERISA, courts
> have no right to torture language in an
> attempt to force particular results
> or to convey delitescent nuances the
> contracting parties neither intended
> nor imagined.  To the exact contrary,
> straightforward language in an ERISA-
> regulated insurance policy should be given
> its natural meaning.

Burnham v. Guardian Life Insurance Co. Of America, 873 F.2d 486, 489 (1st Cir. 1989)(policy coverage denied; Policy language quite clear that decedent was not working as he was required to, "at [employer's] place of business establishment"...words plain and not subject to interpretation).

Plaintiff relies on Santaella for the purpose of determining whether "accident", as used in the Policy, is "overly broad and burdensome, is not calculated to be understood by the average plan participant, and thus violates the spirit of Title 29, Section 1022(a)(1),[6]/ and is void as against public policy."  See Complaint, Count Three.

The Santaella court held that, by looking at the policy "in an ordinary and popular sense, in the way that a person of average intelligence and experience would, we treat the term `accidental'

---

[6]/ See Footnote 1, herein.

as it is commonly defined, as `unexpected or unintentional'"
Santaella, 123 F.3d at 462 (citation omitted).  The court found
that the drug overdose at issue in that case was an accident;
therefore, the defendant could not rely on the self-inflicted
injury exclusion.  In so doing it applied a two-pronged test set
forth in Todd, 43 F.3d at 1456, citing Wickman, that "for a death
under an accidental death policy to be deemed an accident, it
must be determined (1) that the deceased had a subjective
expectation of survival, and, (2) that such expectation was
objectively reasonable, which it is if death is not substantially
certain to result from the insured's conduct."  Santaella, 123
F.3d at 463.  As noted above, as this Court distinguished
Santaella from the present case, the theory therein lends no
support to the claim that "accident" or "self-inflicted injury"
are ambiguous terms.  "As a matter of law, neither of the terms
["accident" and "purposefully self-inflicted injury"] . . . are
ambiguous.  Giving these terms their `plain meanings, meanings
which comport with the interpretations given by the average
person,' Wickman, 908 F.2d at 1084, they are not subject to
reasonable alternative interpretations."   McLain, 820 F.Supp. at
176.

     Other district courts have specifically held that the
"intentionally self-inflicted injury clause is itself
unambiguous."  See Critchlow v. First Unum Life Ins. Co. Of
America, 198 F.Supp.2d 318, 326 (W.D.N.Y 2002)(average person
would have understood what it meant to intentionally inflict

injury or onself). *Accord*, <u>Cronin</u>, 189 F.Supp 2d at 39-40

(citations omitted)(holding that "purposefully self-inflicted

injury" exclusion is not ambiguous, and is not capable of more

than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire

integrated document); *see also*, <u>Bevans</u>, 971 F.Supp. at 360

(holding that exclusion for intentionally self-inflicted injury

is not ambiguous and coverage for injuries resulting from tylenol

overdose was properly excluded under Plan which excluded coverage

for intentionally self-inflicted injury).

The <u>Ann Arbor</u> Court found specifically that a plaintiff's

claim for accidental death benefits was precluded by specific and

exclusionary language barring recovery under circumstances where,

as there, the alcoholic-related death of the insured was

"directly or indirectly caused or contributed to by disease or

illness of any kind". <u>Ann Arbor</u>, 810 F.2d at 593. (alcoholism is

disease)

Inasmuch as Plaintiff has not come forward with one federal

common law, ERISA-based, case which supports any of her

positions, her invitation to "torture" the language of the Policy

is declined.

<u>CONCLUSION</u>

For the reasons set forth herein, the Court holds that

Plaintiff is not entitled to any benefits from the Group Accident

and Sickness Policy issued by Defendant. Neither side has proved

26